STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. HARRIET EVANS, PLAINTIFF IN ERROR.

Argued October 23, 1930—Decided February 2, 1931.

For the plaintiff in error, *Ira F. Smith*.

For the defendant in error, *James Mercer Davis* and *Wilfred H. Jayne, Jr.*

The opinion of the court was delivered by

LLOYD, J. Harriet Evans, the plaintiff in error, was convicted of murder in the first degree without recommendation of life imprisonment, upon which conviction sentence of death was pronounced. On the writ of error we have before us the entire record and proceedings of the indictment and trial, and upon them assignments of error and causes for reversal are filed.

The indictment charged the plaintiff in error, Claude Carmichael, Madison Chapel and Lester Underdown jointly with the murder of Robert Evans. On motion of the state there was a severance of Carmichael and Chapel and the case proceeded to trial against the plaintiff in error and Underdown, both being convicted.

The crime on which the conviction rested was participation in the killing of Mrs. Evans' husband, Robert Evans, at their home on May 15th, 1930. The proofs in the case tended to show that the actual killing was by Underdown, and possibly Carmichael, and that the plaintiff in error was present, aiding and abetting in such killing.

The first reason relied on for reversal is that the court erroneously refused to charge the jury that there was no such thing as "distributing guilt." Just what is meant by this expression may not be entirely clear, but as counsel has

cited for authority the case of *State* v. *Timmerari,* 96 *N. J. L.* 442, it is probably intended as synonymous with "dividing culpabilility," an expression used in the opinion in the cited case. While the specific request was not dealt with in the charge, the jury was clearly instructed as to divided responsibility. It was told that each defendant stood alone in so far as guilt was concerned, and that the guilt or innocence of either did not affect the guilt or innocence of the other.

The second reason is that the court erroneously refused to define "malicious, willful, felonious and malice aforethought," as requested by plaintiff in error. It is sufficient to say that this was completely and correctly answered in the general instruction to the jury.

The third reason is that the court erred in refusing to charge and advise the jury as to the uncorroborated testimony of an accomplice. This instruction is claimed to have been asked in two requests reading as follows: "The court is requested to advise the jury that if the testimony of an alleged accomplice is uncorroborated, the defendant should not be convicted;" also "to caution the jury as to the care to be observed in considering testimony of alleged accomplices." The first was unsound (*State* v. *Bove,* 98 *N. J. L.* 350; *affirmed,* 98 *Id.* 576) and as to the second it was insufficient. If counsel had desired special instructions as to the credibility to be accorded the testimony of an accomplice, it was incumbent on him to formulate that instruction in specific language, in which case only would the court be apprised of the point with which it was intended it should deal.

The sixth request for instruction that the court explain to the jury the limitation of testimony where two or more are jointly indicted and tried together, like the last was wholly insufficient to bring to the court's mind any concrete proposition of law.

The eighth request as argued under the fifth reason assigned for reversal was in effect charged.

It is next said that there was error in the court's instruction as follows: "I think the big thing in this whole case is for you to consider whether you believe the testimony that

the marines with loaded guns walked across the trail, as two of them had testified, to get a couple of guys." This certainly was the big thing in the case as to Underdown, and at best it was a mere expression of the court's opinion which was not binding on the jury, they having been told that the determination of all questions of fact was their responsibility and that they were the sole judges of the evidence, its weight, and the credibility of the witnesses.

The objection to the admissibility of a confession made by Mrs. Evans on the ground that the *corpus delicti* had not been proven is difficult to understand as the body of Evans was clearly identified and established as that of the victim of the homicidal act.

The remaining reasons urged are that the court erred in refusing to direct a verdict of acquittal in favor of the plaintiff in error, and that in this court the judgment should be set aside on the ground that it is so clearly against the weight of the evidence that it cannot be sustained.

We have examined minutely the testimony in the case and have reached the conclusion that not only was the learned trial justice justified in refusing to grant the motion for acquittal, but also that we should refuse to reverse the case here because of the weight of evidence.

The facts in the case, in so far as they bear upon the guilty participation of the plaintiff in error, may be summarized as follows: The defendant Underdown was a marine at the Lakehurst Naval Station. Plaintiff in error lived in a bungalow near this station. Mrs. Evans' husband was also in the Navy on active duty aboard the U. S. S. Overton (which had recently arrived at the Brooklyn Navy Yard), and was to be discharged early in May, 1930. Underdown was a frequent visitor at the Evans home and an infatuation and illicit relationship resulted from these visits. Mrs. Evans expressed to others her affection for Underdown and her dislike of her husband, stating that she wished he was dead, and that she never wanted to see him again. When the time for her husband's discharge neared she expressed a desire that he remain in the navy, declaring that she would not live with him, and

she and Underdown set to work to ascertain the exact time of his return home, sending a messenger to the Brooklyn Navy Yard for the purpose. On the return of this messenger he was asked by Mrs. Evans if he had seen her husband and she was told that her husband did not know when he would get home, whereupon she and Underdown went into Mrs. Evans' room alone. Underdown visited the Overton apparently for like purpose on the day preceding the night of the killing and was informed that Evans had been discharged a few minutes before. About seven o'clock that evening Evans returned to his home with a friend named Duffy and the proofs were that while they were seated in the Evans house, Underdown, Carmichael and Chapel came upon the premises and Underdown, as the result of a preconcerted plan, fired one shot through a window, the curtain of which was up, and Carmichael fired another. Immediately after this Mrs. Evans came out of the house and asked someone to go in and get her pocketbook and Underdown said for someone to stay with her. He and Carmichael then went into the house and proceeded to club Evans and Duffy with the result that one was killed outright and the other died the next day. While they were in the house Mrs. Evans stated to Chapel that Bagwell (who had been enlisted earlier in the conspiracy) had queered the whole business; that her husband had seen a gun on him the day he was on the boat and also one on Underdown. When the two men came out of the house Underdown and Mrs. Evans embraced and kissed each other, she professing her love for him, and declaring that it was a good job and that she was glad it was done. It was then arranged that she would go to her brother's home, about a mile distant, and tell a story of a fight between her husband and Duffy, and that she was afraid to stay in the house. This she did and when her brother offered to go she told him not to do so as Bob would shoot anyone who came in the yard. She also opposed the calling of the state troopers. She made no mention of the killing. On the same night she told a neighbor that her husband had threatened to kill her, that she went out of the house and that he fired a shot at her

through the window. She also told this neighbor about a quarrel between her husband and Duffy.

From this it is clear that the trial judge could not withdraw the case from the jury, and we think it is also clear that the evidence fully justified a finding by the jury of the guilty participation of the plaintiff in error in the crime which resulted in the death of her husband.

Finding no error, the judgment is affirmed.

*For affirmance*—THE CHIEF JUSTICE, TRENCHARD, CAMPBELL, LLOYD, CASE, DALY, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 12.

*For reversal*—None.